# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 24-712V

|  |  |
|---|---|
| CHRISTINA MOLNAR, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: May 14, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for Petitioner.*

*Tyler King, U.S. Department of Justice, Washington, DC, for Respondent.*

### FACT RULING[1]

On May 7, 2024, Christina Molnar ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a Table shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on October 4, 2021. Pet. at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

A dispute has arisen between the parties regarding whether Petitioner's post-vaccination symptoms were limited to the shoulder in which the subject flu vaccine was administered. For the reasons set forth below, I find in favor of the Petitioner on this topic.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.   Relevant Procedural History

Following initiation of the instant claim, the parties attempted to informally resolve damages but were ultimately unsuccessful. ECF Nos. 20-23. Respondent thereafter filed his Rule 4(c) Report in defense of this case on September 23, 2025. Respondent's Report, ECF No. 24. In it, he made one argument against Petitioner's ability to establish a Table SIRVA claim: that her medical records do not support the conclusion that her post-vaccination symptoms were limited to the vaccinated shoulder. *Id.* at 5-6. This issue is now ripe for consideration.

## II.   Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19. And, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Indeed, the United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events

when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014). The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## III.    Relevant Factual Evidence

I make this finding after a complete review of the record to include all medical records, declarations, and additional evidence filed, and in particular the following:[3]

- Petitioner received the subject vaccine in her left deltoid on October 4, 2021, during a routine follow-up visit with her rheumatologist for treatment of her pre-existing Sjögren's syndrome. Ex. 1 at 326. Petitioner's complaints during this visit included right thumb numbness and burning pain in her left hip, which the treater assessed as possible inflammatory arthritis and bursitis, respectively. *Id.* at 345-46.

- On October 25, 2021, Petitioner saw her primary care provider for "[i]mmunization pain: neck shoulder down arm." Ex. 1 at 320. Petitioner stated that she "received her flu vaccine on 10/4 . . . [s]ince then she has had some discomfort in the area[.]" *Id.* at 320-21. She also had "[c]omplaints of pain from below injection site to elbow, burning sensation, arm feeling heavy." *Id.* She emphasized that she "continues to have pain in her left arm/shoulder[;]" but that the pain "will sometimes radiate to the left side of her neck . . . and going down to her wrist." *Id.* at 321. The assessment included an injection site reaction versus muscle strain, acute pain of the left shoulder, and a burning sensation (for which Petitioner received a

---

[3] While I have reviewed *all* the evidence filed to-date in this case, only evidence related to whether Petitioner's symptoms were limited to the vaccination shoulder will be discussed herein, though other facts may be provided as necessary to provide additional context.

neurology referral).[4] *Id.* at 322-23. An x-ray of the left shoulder showed mild degenerative changes. *Id.* at 310.

- The next day (October 26, 2021), Petitioner had her physical therapy ("PT") evaluation. Ex. 1 at 301. Petitioner noted a "chief complaint of left shoulder pain that started on 10/4/2021 after getting a flu vaccine." *Id.* Petitioner noted that the "pain has been increasing and is now radiating to elbow and up into upper trap region." *Id.* The treater recommended therapy "to promote increased mobility of left shoulder[.]" *Id.* Petitioner's PT goals included to "[s]top pain at left shoulder/UE." *Id.*

- Petitioner sought care with an orthopedist on November 30, 2021. Ex. 1 at 269. Petitioner reported a "chief complaint of left shoulder pain" that had been present for two months and "is located anterior shoulder and anteriolateral upper arm." *Id.* at 270. Petitioner linked her pain to her receipt of the subject flu vaccine. *See id.* An examination was focused on the left shoulder and revealed normal range of motion ("ROM"), painful arc with motion, and normal strength. *Id.* at 272. The orthopedist assessed Petitioner with "left biceps tendonitis." *Id.*

- On March 6, 2022, Petitioner followed up with her orthopedist's office for a "[c]hief complaint [of] left shoulder pain. Still biceps area." Ex. 1 at 183. The treater reviewed Petitioner's left shoulder MRI findings, and felt the imaging was consistent with "tendinosis of the biceps[,] rotator cuff tendinosis." *Id.* The treater recommended a subacromial steroid injection and to consider "arthroscopy and biceps tenotomy" if her issues continued. *Id.* at 184.

- Following another course of PT for left shoulder symptoms (e.g., Ex. 1 at 125), Petitioner saw another orthopedist in the same office on May 16, 2022. Ex. 1 at 92. Petitioner complained of a seven-month history of left shoulder pain with "intermittent pain in the anterior aspect of her upper arm and anterior shoulder." *Id.* When asked if Petitioner had "neck complaints" the entry lists "none." *Id.* at 93. An examination of the left shoulder showed slightly diminished ROM; the orthopedist assessed Petitioner with left shoulder rotator cuff tendinosis and left shoulder impingement syndrome but noted there were no signs of rotator cuff tearing seen on MRI. *Id.* at 82-84, 96. She received another steroid injection in the left shoulder. *Id.* at 96.

---

[4] It does not appear that Petitioner sought care with a neurologist for these issues. Rather, it seems as though Petitioner later sought care with a neurologist for unrelated headaches and migraines. *See generally* Ex. 7.

- Several months later, on November 18, 2022, Petitioner saw another orthopedist for treatment of her left shoulder biceps tendonitis and impingement syndrome. Ex. 5 at 96. She noted that the shoulder pain "will radiate [to] the biceps." *Id.* at 103. Petitioner ultimately received a third steroid injection in the left shoulder in January 2023. Ex. 3 at 206.

- Petitioner attended another orthopedic follow-up visit for her left shoulder pain on May 4, 2023. Ex. 3 at 147. She received another steroid injection in the left glenohumeral joint. *Id.* Petitioner thereafter underwent three additional PT sessions (through December 2023), and experienced "improved left shoulder mobility and strength." *See,* e.g., Ex. 6 at 40.

- In her declaration, Petitioner attested that she experienced immediate post-vaccination pain in her left shoulder. Ex. 2 ¶ 9. She explained that the pain did not subside but rather became more severe. *Id.* ¶ 10. She also experienced a "burning, tightness and [her] arm felt heavy like a bean bag[,]" plus an "uncomfortable sensation that radiated up to [her] neck and down to [her] elbow." *Id.*

- No other medical record or affidavit/witness declaration evidence regarding whether Petitioner's pain was limited to her left shoulder has been filed.

## IV.    Finding of Fact Regarding Symptoms Limited to Vaccinated Shoulder

The third QAI requirement for a Table SIRVA requires a petitioner's pain and reduced range of motion to be "limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii).

Respondent contests Petitioner's satisfaction of this element, as Petitioner's medical records document radiation of pain to the left side of her neck and down to her wrist. Respondent's Report at 5-6 (citing Ex. 1 at 321). There are ample instances in the record in which non-shoulder concerns are reported, and thus Respondent's objection is more than reasonable. However, I find that this QAI can still be preponderantly met on the basis of this record.

First, Petitioner's records consistently reflect reports of left shoulder pain and examinations revealing diminished ROM,[5] which are consistent with other SIRVA cases.

---

[5] Although it appears Petitioner likely did not experience reduced ROM during her earlier post-vaccination visits (e.g., Ex. 1 at 272, 322), Petitioner ultimately demonstrated reduced ROM (to some degree) later on in her course of treatment. *See,* e.g., Ex. 5 at 103.

Petitioner's diagnostic procedures were also limited to her left shoulder, and she received treatment for left shoulder pain and restricted mobility, specifically. *See,* e.g., Ex. 1 at 183, 301; Ex. 6 at 40.

Second, although there are record references to pain extending outside the vaccinated shoulder, the totality of the evidence supports a finding that Petitioner's pain *originated* from the shoulder. *Compare* Ex. 1 at 320-21 (an October 25, 2021 report of "[i]mmunization pain: neck shoulder down arm" and "pain from below injection site to elbow," and that the shoulder pain "will sometimes radiate to the left side of her neck . . . and going down to her wrist."), *and id.* at 301 (an October 26, 2021 report of left shoulder pain that was "now radiating to elbow and up into upper trap region."); *with id.* at 269-70 (a November 30, 2021 report of left shoulder pain "located anterior shoulder and anteriolateral upper arm."), *id.* at 183 (a March 6, 2022 "[c]hief complaint [of] left shoulder pain. Still biceps area."), *and id.* at 92-93 (a May 16, 2022 report of "intermittent pain in the anterior aspect of her upper arm and anterior shoulder" and no neck pain).

In the Program, special masters have found that SIRVA claims featuring complaints of pain *primarily* occurring in the shoulder are valid under the Table, even if there are additional allegations of pain extending to adjacent parts of the body. *K.P. v. Sec'y of Health & Hum. Servs*., No. 19-65V, 2022 WL 3226776, at *8 (Fed. Cl. Spec. Mstr. May 25, 2022) (holding that "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body").

The mere fact that a claimant has raised complaints of pain elsewhere physically does not automatically disqualify the claim as a SIRVA. Indeed, the gravamen of the third QAI criterion is intended to "guard against compensating claims involving patterns of pain or reduced [ROM] indicative of a contributing etiology *beyond* the confines of a musculoskeletal injury to the affected shoulder." *Grossmann v. Sec'y of Health & Hum. Servs.,* No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (emphasis added); *Werning v. Sec'y of Health & Hum. Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QAI criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder"); *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding that "despite the notations of pain extending beyond the shoulder, Petitioner's injury is consistent with the definition of SIRVA and there is not preponderant evidence of another etiology"). Resolution of this QAI, like all elements of a Table claim, involves a preponderant balancing of proof – and if that balancing suggests *primarily* shoulder concerns, that is enough.

Here, Petitioner did report instances of pain extending beyond the shoulder that would not be consistent with a SIRVA, but her injury and diagnoses (specific to shoulder joint pathology) were SIRVA-oriented, and she was treated accordingly. *See,* e.g., *Durham v. Sec'y of Health & Hum. Servs.,* No. 17-1899V, 2023 WL 3196229, at *11-13 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) (finding "this is not a case where the medical records reflect that the symptoms beyond the confines of the shoulder are incidental to what was otherwise clearly treated as a shoulder injury," as the petitioner showed prominent symptoms of radiculopathy/numbness into the hand and neck, there ultimately was not any confirmed final diagnosis of a shoulder joint pathology, and a cervical etiology was deemed more likely by physicians).

The evidence supporting SIRVA-related symptoms of shoulder pain and limited mobility here outweighs the incidental complaints of pain stemming *from* the shoulder extending into the neck or down into her elbow and/or wrist (that ultimately did *not* receive a separate diagnosis). Petitioner has therefore established this QAI criterion. (Nevertheless, damages in this case cannot be calculated based upon bicep or lower-arm concerns or treatment).

### Conclusion and Scheduling Order

I encourage the parties to promptly re-attempt an informal resolution of this claim (of either settlement or proffer) before expending any further litigative resources on the case. If at any time informal resolution appears unlikely, the parties should propose a method for moving forward, i.e., with a proposed briefing schedule or requesting transfer out of SPU.

Accordingly, **by no later than Monday, June 15, 2026**, the parties shall file a joint status report confirming the date on which Petitioner conveyed, or intends to convey, a reasonable settlement demand and supporting documentation for Respondent's consideration. **If applicable, the status report may also state whether Respondent wishes to file an amended Rule 4(c) report and stating how much time is needed to submit said report.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master